United States District Court
Southern District of Texas
**ENTERED**
March 07, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| Plaintiff, | § § | |
| v. | § § | CRIMINAL NUMBER H-15-060-1 |
| RAYNARD GRAY, | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

On March 1, 2017, the court held a hearing to determine whether the defendant, Raynard Gray, is competent to stand trial. For the reasons stated below, the court concludes that the defendant is competent.

### I. Background

Defendant is charged in an eight-count indictment with charges relating to several bank robberies. Defendant was indicted along with six others on February 4, 2015. At defense counsel's request, Defendant was evaluated for potential intellectual disability by Dr. Diane Bailey, a clinical psychologist.[1] Dr. Bailey conducted a series of tests on Defendant and interviewed his mother.

---

[1] Defendant's Motion for Psychiatric or Psychological Examination and for Hearing to Determine Competency ("Motion for Competency Hearing"), Docket Entry No. 215; Diane L. Bailey, Intellectual/Adaptive Evaluation ("Bailey Evaluation") (May 30, 2016) (Although testifying experts referred to Dr. Bailey's evaluation, neither party sought to have it admitted or relied on facts contained therein.).

Dr. Bailey's findings suggested that Defendant presented with a mild intellectual disability.[2]

The court then ordered a mental competency evaluation.[3] The evaluation was conducted by Dr. Tenille Warren-Phillips, a licensed psychologist.[4] Dr. Warren-Phillips evaluated Defendant from June 16, 2016, to July 17, 2016, conducting two clinical interviews with Defendant and interviews with defense counsel, a defense investigator, Defendant's mother, and staff at the Federal Detention Center in Houston, Texas. Defendant's scores on tests for mental competency consistently fell between average scores for norm groups of defendants determined to be incompetent and those found to be competent. Dr. Warren-Phillips ultimately concluded that Defendant was not competent to proceed.

Test results from the Validity Indicator Profile ("VIP") during Dr. Warren-Phillips' evaluation indicated that Defendant's response style was rated "Irrelevant," indicating that his profile was "likely an invalid indication of his true ability and that other tests of cognitive ability [would] likely yield similar results."[5] Dr. Warren-Phillips attributed the result to either Defendant's poor reasoning ability or to his lack of full

---

[2] Bailey Evaluation, p. 7.

[3] Order for Mental Competency Evaluation, Docket Entry No. 220.

[4] Evaluation of Competence to Proceed ("Warren-Phillips Evaluation"), Docket Entry No. 242.

[5] Id. at 6.

engagement in the testing process.[6] The Government objected to the findings and moved for a second evaluation on the basis of "incomplete information" and a "deficient basis" for Dr. Warren-Phillips' conclusion.[7] On September 1, 2016, the court granted the motion and ordered a second evaluation.[8]

The second evaluation was conducted by Dr. Lisa Bellah, a licensed psychologist, over a 30-day period at the Federal Correctional Institution in Fort Worth, Texas.[9] Dr. Bellah interviewed Defendant, conducted other interviews, reviewed the records of previous evaluations, performed psychological testing, and reviewed records of Defendant's phone calls and emails.[10] Dr. Bellah determined that Defendant's poor performance on tests was not the result of inability or disengagement but of malingering.[11] Based on Defendant's intentional poor performance, Dr. Bellah concluded that further testing would be pointless.[12]

---

[6] Id.

[7] United States' Objections to Competency Evaluation and Motion for Second Evaluation, Docket Entry No. 243.

[8] Hearing Minutes, Docket Entry No. 244; Order for Second Mental Competency Evaluation, Docket Entry No. 245.

[9] Lisa Bellah, Psychological Evaluation ("Bellah Evaluation"), Docket Entry No. 293-1.

[10] Id. at 1-2.

[11] Id. at 15-16.

[12] See id. at 12 ("Due to his results on the VIP and TOMM, further tests of his cognitive ability were not given, as they were not likely to yield valid or reliable measures of his true intellectual functioning.").

Instead, she relied primarily on records of Defendant's observed behavior outside of the testing environment. Based primarily on Defendant's interactions with other inmates and communication during phone calls and emails, Dr. Bellah concluded that Defendant was competent to stand trial.

Defendant objected to Dr. Bellah's findings and sought further evaluation, which the court granted. The fourth psychological evaluation, the third for competency to stand trial, was conducted by Dr. Michael Chafetz and consisted of a two-day intensive evaluation and interview as well as a review of Defendant's records, including those from the previous evaluations.[13] Dr. Chafetz, too, found evidence of malingering.[14] But after applying approaches intended to compensate for the invalid test results, Dr. Chafetz concluded that Defendant was not competent to stand trial.[15]

All four evaluations were submitted to the court before the competency hearing. Both Dr. Bellah and Dr. Chafetz testified at the hearing, and the parties were given the opportunity to cross-examine the experts.

## II. Legal Standard

"The question of competency . . . is a mixed question of law and fact which has direct constitutional repercussions."

---

[13] Michael Chafetz, Neuropsychological Evaluation ("Chafetz Evaluation"), Docket Entry No. 283.

[14] Id. at 15.

[15] Id.

United States v. Makris, 535 F.2d 899, 907 (5th Cir. 1976), cert. denied, 97 S. Ct. 1598 (1977). "The conviction of a mentally incompetent defendant violates the Due Process Clause." DeVille v. Whitley, 21 F.3d 654, 656 (5th Cir.), cert. denied, 115 S. Ct. 436 (1994). In 18 U.S.C. § 4241 Congress established a statutory procedure for courts to follow when making the difficult and important determination of whether a defendant is competent to stand trial. In order to declare a defendant incompetent to stand trial, a district court must find "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The Government bears the burden of demonstrating a defendant's competency by a preponderance of the evidence. United States v. Hutson, 821 F.2d 1015, 1018 (5th Cir. 1987).

Competency requires more than factual orientation and recollection. Dusky v. United States, 80 S. Ct. 788, 789 (1960) (per curiam). The appropriate test is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as [a] factual understanding of the proceedings against him." Id. Moreover, "a person whose mental condition is such that he lacks the capacity . . . to assist in preparing his

defense may not be subjected to a trial." Drope v. Missouri, 95 S. Ct. 896, 903 (1975).

The question of incompetency is one of degree. Cf. United States v. Stevens, 461 F.2d 317, 320 (7th Cir. 1972). A person is not rendered incompetent merely because he is mentally ill to some degree. Hall v. United States, 410 F.2d 653 (4th Cir.), cert. denied, 90 S. Ct. 455 (1969). Rather, "([c]ompetency) denotes the intellectual and emotional capacity of the accused to perform the functions which are essential to the fairness and accuracy of a criminal proceeding." Pouncey v. United States, 349 F.2d 699 (D.C. Cir. 1965).

In determining the competency of a defendant the judge is the fact-finder. Id. The testimony of experts is only one factor and rises no higher than the reasons on which it is based and is not binding on the court. Hodges v. United States, 408 F.2d 543, 553 (8th Cir. 1969). Courts "may rely upon various kinds of evidence, including written medical opinions and observations by the court, counsel, and defendant himself regarding the defendant's demeanor and fitness to stand trial." United States v. Muriel-Cruz, 412 F.3d 9, 13 (1st Cir. 2005). The court is entitled to accept portions of expert testimony yet reject an expert's ultimate conclusion. Pike v. Guarino, 492 F.3d 61, 76 (1st Cir. 2007) (citations omitted); United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000).

## III. Analysis

### A. Mental Disease or Defect

#### 1. Evidence of Malingering

Three of Defendant's four evaluators found that at least some of his psychological test results were likely invalid.[16] The testifying experts both found evidence of malingering.[17] The results obtained by Dr. Bellah on three tests in particular illustrate both the presence and extent of Defendant's deception. On the VIP, a test administered to "assess [Defendant's] level of cognitive effort," Dr. Bellah noted two particularly relevant facts. First, when Dr. Warren-Phillips administered the test, Defendant's responses exhibited a purposeful pattern, "11221122," indicative of a "lack of effort or attention."[18] Second, when Dr. Bellah administered the Nonverbal subtest, a component that typically takes approximately 45 minutes to an hour to complete,

---

[16] See, e.g., Warren-Phillips Evaluation, Docket Entry No. 242, p. 7 ("The data was reviewed and Mr. Gray's response style was rated 'Irrelevant.' This means the VIP profile is likely an invalid indication of his true ability and that other tests of his cognitive ability will likely yield similar results."); Bellah Evaluation, Docket Entry No. 293-1, p. 9 ("Once again, Mr. Gray obtained an Invalid profile with an Irrelevant response style. However, it was clear that his current performance was due to poor effort, as opposed to intellectual disability."); Chafetz Evaluation, Docket Entry No. 283, p. 9 ¶ 6 ("However, these low scores were likely affected by invalidity.").

[17] Bellah Evaluation, Docket Entry No. 293-1, pp. 9-12; Chafetz Evaluation, Docket Entry No. 283, pp. 14-15.

[18] Bellah Evaluation, Docket Entry No. 293-1, p. 6.

Defendant completed it in less than five minutes.[19] Dr. Bellah concluded that this indicated Defendant "did not display good, if any, attention to item content."[20]

Defendant's results on other tests show more than a mere lack of effort. On the Inventory of Legal Knowledge ("ILK"), Defendant's score "most closely resembled" a normative group of individuals who had been instructed to "purposely malinger deficits in legal knowledge."[21] Despite his familiarity with the criminal justice system, Defendant scored in the 24th percentile among individuals found incompetent to stand trial.[22] Finally, on the Test of Memory Malingering ("TOMM") Defendant achieved scores of 21, 26, and 18 on Trial One, Trial Two, and the Retention test, respectively.[23] By comparison, a 43-year-old test-taker with a severe learning disability, seizure disorder, alcohol abuse, depression, diabetes, hypertension, asthma, and obesity obtained scores of 48, 50, and 50.[24] Another subject suffering from a closed head injury resulting from a motorcycle accident obtained scores of

---

[19] Id. at 9.

[20] Id.

[21] Id. at 12.

[22] Id.

[23] Id. at 10-11.

[24] Id. at 11.

38, 48, and 50.[25] Finally, a subject diagnosed with Huntington's disease and a borderline IQ obtained scores of 42, 50, and 50.[26]

In light of the strong evidence of malingering on tests meant to detect such behavior, the court questions Defendant's test results and self-reported capacity and accordingly gives them little weight. The evidence establishes that Defendant had no interest in assisting his evaluators to determine his actual mental abilities. The court must therefore look to other factors to determine whether Defendant is competent to stand trial.

2.  Corrective Approaches

Because the tests of Defendant's cognitive function were suspect, other evidence -- especially evidence of his adaptive function -- is more important in assessing competence. Both Dr. Chafetz and Dr. Bellah, faced with invalid test results, attempted to determine Defendant's mental capacities using other means. Dr. Chafetz agreed that Defendant was malingering. To account for this he performed a statistical regression and completed a Test of Premorbid Functioning ("TOPF") in which Defendant's "demographic background was used to provide an estimate of his IQ score" free from the effects of his malingering.[27] Dr. Bellah interviewed staff who had interacted with Defendant

---

[25]Id.

[26]Id.

[27]Chafetz Evaluation, Docket Entry No. 283, p. 8.

during the observation period and reviewed email correspondence and recorded phone calls.

After noting that the determination of whether Defendant suffers from a mental defect was "complicated . . . by the findings of malingering in which [Defendant] apparently has attempted to lower his scores (reducing the appearance of his abilities) in an apparent effort to escape punishment," Dr. Chafetz first performed a statistical regression using equations derived from his research.[28] As a baseline, Dr. Chafetz used the Full Scale Intelligence Quotient ("FSIQ") of 51 obtained from his own administration of the Wechsler Adult Intelligence Scale-IV (WAIS-IV), resulting in an IQ estimated range of 65.4 to 68.1.[29] Dr. Chafetz did not, however, address the fact, noted earlier in his report, that Defendant had previously obtained an FSIQ of 62 when Dr. Warren-Phillips administered the same test.[30] Nor did he address the effects that using her score, or attempting to account for the disparity, might have had on his findings.

Dr. Chafetz next applied his TOPF, which resulted in an estimated FSIQ of 73.[31] Dr. Chafetz testified that an error band of +/-5 should be applied to this score for an estimated FSIQ range

---

[28] Id. at 11-12.

[29] Id. at 12.

[30] Id. at 3.

[31] Id. at 12.

of 68 to 78,[32] placing Defendant in the "Well Below Average" (70-79) to "Lower Extreme" (69 and below) range. If Defendant were in the lower end of the range, he might fall below "the typical cutoff of IQ of 70 for Intellectual Disability," thus satisfying one prong of § 4241.[33] But as Dr. Chafetz's own testimony reflects, Defendant's IQ score cannot be determined with any greater degree of accuracy because of this error band. The TOPF is therefore limited to showing that Defendant _may_ suffer from a mental defect.

Dr. Bellah's corrections for the effects of Defendant's malingering were more practical than theoretical. She relied in part on interviews and observations of Defendant's behavior outside of the testing environment. Dr. Bellah found that

- Defendant "was observed to present as euthymic[34] and sociable" while in the Jail Unit;

- Defendant used the phone multiple times daily;

- Defendant's phone calls "indicated that he was generally able to recall names, dates, and various telephone numbers" and "was capable of discussing personal background information with family," including past conversations;

---

[32]Dr. Chafetz cited the Supreme Court's discussion of IQ testing in Hall v. Florida, 134 S. Ct. 1986 (2014), in which the Court declared invalid a Florida law for setting a bright line score cutoff of 70 for mental disability in the death penalty context. This court acknowledges and has taken into account the Supreme Court's guidance from that holding.

[33]Chafetz Evaluation, Docket Entry No. 283, p. 12.

[34]Euthymic: Relating to, or characterized by, euthymia. Euthymia: 1. Joyfulness; mental peace and tranquility. 2. Moderation of mood, not manic or depressed. Stedmans Medical Dictionary (2014).

- Defendant's "thought processes were logical, coherent, and sequential;"

- Defendant was observed playing dominoes with other inmates and even keeping score; and

- Defendant showed an understanding of "all the rules that have been dictated to him."[35]

These uncontested findings reveal Defendant's adaptive functioning and mental capacity when observed free from the effects of malingering.

3.   Findings and Conclusions

Of the three competency evaluations, the court finds Dr. Bellah's to be the most thorough and credible. Thus, the court affords her evaluation the greatest weight. See United States v. General, 278 F.3d 389, 398 (4th Cir. 2002) (holding that a report was "entitled to significant weight because it [was] the most recent and comprehensive evaluation" of a defendant's competency). Dr. Warren-Phillips' evaluation was essentially limited to self-reporting and interviews with Defendant, his mother, and defense counsel's investigator.[36] And although Dr. Warren-Phillips found some of Defendant's results invalid, she did not address the possibility of malingering. Dr. Chafetz's evaluation was limited to a two-day intensive battery of testing, interviews, and a review

---

[35]Bellah Evaluation, Docket Entry No. 293-1, pp. 8-9.

[36]Warren-Phillips Evaluation, Docket Entry No. 242, p. 2. Although Dr. Warren-Phillips states that she interviewed FDC Houston staff, she does not appear to have relied on those interviews in forming her opinion.

of records. Moreover, on the issue of Defendant's adaptive functioning skills, Dr. Chafetz did not accept the test results he obtained at face value, stating: "[I]t is not believed that his adaptive functioning skills are this low, and that more likely the previously obtained levels are closer to the truth."[37] Taking into account Defendant's malingering and the circumstances of each of the evaluations, the court credits Dr. Bellah's findings that Defendant exhibits borderline intellectual functioning and that there is insufficient evidence that he suffers from a mental disease or defect.

B.  Competency

Assuming arguendo that Defendant suffers from a mental defect, the court must determine whether that defect "render[s] him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Aside from the questionable results of testing and self-reporting, the weight of the credible evidence supports the opposite conclusion.

Recordings of Defendant's phone calls reflect that

- Defendant understood the consequences of accepting a plea arrangement;[38]

---

[37]Chafetz Evaluation, Docket Entry No. 283, p. 11.

[38]06-28-16 @ 1503 Plea-30 Years, Government's Exhibit 1.

- Defendant weighed the consequences of a 30-year sentence against the risk of going to trial;[39]

- Defendant knew the names of anticipated alibi witnesses and the reasons why others might testify against him;[40]

- Defendant understood and appeared to calculate percentages for a bail bond and understand the consequences of being denied bail;[41] and

- Defendant understood that he had been charged with additional offenses and the basis for those charges.[42]

This evidence provides the most comprehensive and accurate picture of Defendant's capacity to understand the nature and consequences of the proceedings against him. Defendant's own phone calls indicate that he is aware of the nature of the charges against him and the consequences of pleading guilty as opposed to going to trial. He can recall the names of alibi witnesses and appears to understand how they fit into his defense. He is aware of why his former co-defendants might testify against him. In short, he seems to have an adequate understanding of the proceedings. He also exhibits a capacity to communicate that information in a manner sufficient to assist in his own defense.

---

[39] Id.

[40] 06-27-16 @ 1839 Alibi-Witnesses, Government's Exhibit 1; 06-28-16 @ 1503 Witnesses, Government's Exhibit 1.

[41] 06-29-16 @ 2107 Bond, Government's Exhibit 1.

[42] 06-28-16 @ 1503 New Charges-Discharge, Government's Exhibit 1.

## IV.  Conclusion and Order

After having granted Defendant's Motion for Psychiatric or Psychological Examination and for Hearing to Determine Competency (Docket Entry No. 215) and having complied with the requirements of 18 U.S.C. §§ 4241 and 4247(b), the court finds Defendant Raynard Gray competent to stand trial.  Trial will begin as scheduled on March 20, 2017, at 1:00 p.m., in Courtroom 9-B, Ninth Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this the 7th day of March, 2017.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE